UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

*FILED*

*FEB 19 2004*

*PAMELA S HOLLIS*
*BANKRUPTCY JUDGE*

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| ARCHIBALD CANDY CORPORATION, | ) | (Jointly Administered) |
| *et. al.*, | ) | |
| | ) | Case Nos.  04 B 3200 |
| Debtors. | ) | |
| | ) | Related Doc: Docket No. 57 |

STIPULATION AND FINAL ORDER AUTHORIZING (A)
SECURED POST-PETITION FINANCING ON A SUPER PRIORITY BASIS
PURSUANT TO 11 U.S.C. § 364, (B) USE OF CASH COLLATERAL
PURSUANT TO 11 U.S.C. § 363 AND (C) GRANT OF ADEQUATE
PROTECTION PURSUANT TO 11 U.S.C. §§ 363 AND 364 *[ E00 19 ]*

Upon the motion (the "Motion") dated January 28, 2004 of Archibald Candy

Corporation and Laura Secord Holdings Corp., each a Delaware corporation, as debtors and

debtors-in-possession (the "Debtors"), (a) seeking this Court's authorization pursuant to Section

363(c) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the

"Bankruptcy\Code") and Rules 2002, 4001(c) and 9014 of the Federal Rules of Bankruptcy

Procedure (the "Bankruptcy Rules"), for the Debtors, inter alia, (i) to obtain post-petition

financing (the "Post-Petition Financing"), up to an aggregate principal amount not to exceed

$13,500,000 plus accrued interest on the aggregate principal amount (the "Commitment") from

LaSalle Business Credit, LLC (the "Lender"); (ii) to grant the Lender, pursuant to Bankruptcy

Code §§364(c) and (d), security interests in all of the Debtors' currently owned and after

acquired property to secure the Debtors' obligations under the Post-Petition Financing and (iii) to

grant the Lender priority in payment with respect to such obligations over any and all

administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other

than as described below; (b) seeking this Court's authorization to use the Lender's and the

Subordinated Secured Lenders' (as hereinafter defined) cash collateral within the meaning of

Bankruptcy Code § 363(a) (the "Cash Collateral"), pursuant to Bankruptcy Code § 363(c) and to

provide adequate protection, pursuant to Bankruptcy Code §§ 361, 363(e) and 364(c) and (d) to

the Lender and the Subordinated Secured Lenders (as hereinafter defined); and (c) seeking a

preliminary hearing (the "Preliminary Hearing") on the Motion to consider entry of an interim

order pursuant to Bankruptcy Rule 4001 (the "Interim Order") authorizing the Debtors to borrow

from the Lender under the Post-Petition Financing up to an aggregate of $12,000,000 plus

accrued interest on the aggregate principal amount (inclusive of Letters of Credit) upon the terms

and conditions set forth in the Interim Order pending the Final Hearing referred to below; and (c)

requesting that a final hearing (the "Final Hearing") be scheduled by this Court to consider entry

of a final order (this "Order") authorizing on a final basis, inter alia, the Post-Petition Financing;

and due and sufficient notice of the Motion under the circumstances having been given; and the

Final Hearing on the Motion having been held before this Court; and upon the entire record of

this case and made at the Preliminary and Final Hearings, and this Court having found good and

sufficient cause appearing therefor;

The Debtors, the Lender, the Secured Second Priority Term Loan Holders (as defined

below) and the Indenture Trustee (as defined below), STIPULATE and AGREE for all purposes,

including in these Chapter 11 Cases (as defined below), and, the Court hereby makes the

following FINDINGS:

A.      On January 28, 2004 (the "Filing Date"), the Debtors filed voluntary petitions for

relief with this Court under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").  The

Debtors are continuing in possession of their property, and operating and managing their

businesses, as debtors-in-possession pursuant to Bankruptcy Code §§ 1107 and 1108.

- 2 -

B.      This Court has jurisdiction over the Chapter 11 Cases and the Motion pursuant to

28 U.S.C. §§ 157(b) and 1334.  Consideration of the Motion constitutes a core proceeding as

defined in 28 U.S.C. § 157(b)(2).

C.      The Lender, as lender, and Archibald Candy Corporation (the "Borrower"), as

borrower, are party to that certain Loan and Security Agreement, dated as of June 26, 2003 (as

amended, supplemented or otherwise modified prior to the commencement of these Chapter 11

Cases and as amended hereby, including, without limitation, Amendment No. 2 to Loan

Agreement dated January 28, 2004 and attached hereto as Exhibit 1, the "Pre-Petition Credit

Agreement") and all collateral and ancillary documents executed in connection therewith (the

"Pre-Petition Loan Documents").  A true and correct copy of the Pre-Petition Credit Agreement

and the amendments thereto is attached as Exhibit A to the Appendix to the Motion and

incorporated herein by reference.  Unless otherwise specified, all capitalized terms used but not

defined herein shall have the meanings given in the Pre-Petition Credit Agreement.  The

provisions of this paragraph C constitute a stipulation by the Debtors and not a finding by the

Court.

D.      Pursuant to that certain Secured Continuing Unconditional Guaranty dated as of

June 26, 2003, executed by Laura Secord Holdings Corp. ("Laura Secord") in favor of the

Lender (the "Parent Guaranty") and that certain Guarantee dated as of June 26, 2003, executed

by Archibald Candy (Canada) Corporation ("Archibald Canada" and, together with Laura

Secord, the "Guarantors") in favor of the Lender (the "Subsidiary Guaranty," and together with

the Parent Guaranty, the "Guaranties") the Guarantors have unconditionally guaranteed all of

Borrower's Pre-Petition Indebtedness (as defined below) to the Lender.  Pursuant to that certain

Security Agreement dated as of June 26, 2003, executed by Laura Secord in favor of the Lender,

CHI657231.12

that certain General Security Agreement dated as of June 26, 2003, executed by Archibald

Canada in favor of the Lender, that certain Movable Hypothec dated June 26, 2003, executed by

Archibald Canada in favor of the Lender, that certain Trademark Security Agreement dated as of

June 26, 2003, executed by the Borrower and Laura Secord in favor of the Lender and that

certain Copyright Security Agreement dated as of June 25, 2003, executed by the Borrower and

Laura Secord in favor of the Lender (collectively, the "Guarantor Security Agreements"),

Guarantors pledged substantially all of their assets to secure the Obligations (as defined in the

Guarantor Security Agreements) of the Borrower. Pursuant to that certain Securities Pledge

Agreement dated as of June 26, 2003, executed by Laura Secord and Borrower in favor of the

Lender and that certain Securities Pledge Agreement dated as of June 26, 2003, executed by

Laura Secord in favor of the Lender (collectively, the "Guarantor Pledge Agreements" and,

together with the Guarantor Security Agreements and the Guaranties, collectively, the

"Guarantor Documents") the Borrower has pledged the stock of Laura Secord and Laura Secord

has pledged the stock of Archibald Canada to the Lender and secured the obligations of the

Borrower to the Lender. The Guaranties, the Guarantor Security Agreements and the Guarantor

Pledge Agreements shall each be deemed to be Pre-Petition Loan Documents. By the signature

of Laura Secord's attorney hereto, Laura Secord (i) acknowledges and confirms that each of the

Guarantor Documents to which it is a party continues in full force and effect notwithstanding any

financing and financial accommodations extended by the Lender to the Debtors pursuant to the

terms of this Order and are ratified and reaffirmed in all respects and (ii) agrees that all

indebtedness, liabilities and obligations of the Debtors to the Lender arising from or in

connection with the financing and financial accommodations extended by the Lender to the

Debtors pursuant to the terms of this Order are unconditionally guaranteed by the Parent

- 4 -

Guaranty and secured by the Guarantor Security Agreements and the Guarantor Pledge
Agreements to which it is a party, notwithstanding anything in such Guarantor Documents to the
contrary. By a separate Reaffirmation dated as of January 28, 2004, executed by Archibald
Canada in favor of the Lender (the "Reaffirmation Agreement"), Archibald Canada has (i)
acknowledged and confirmed that each of the Guarantor Documents to which it is a party
continues in full force and effect notwithstanding any financing and financial accommodations
extended by the Lender to the Debtors pursuant to the terms of this Order and are ratified and
reaffirmed in all respects and (ii) agreed that all indebtedness, liabilities and obligations of the
Debtors to the Lender arising from or in connection with the financing and financial
accommodations extended by the Lender to the Debtors pursuant to the terms of this Order are
unconditionally guaranteed by the Subsidiary Guaranty and secured by the Guarantor Security
Agreements and the Guarantor Pledge Agreements to which it is a party, notwithstanding
anything in such Guarantor Documents to the contrary. The provisions of this paragraph D
constitute a stipulation by the Debtors and not a finding by the Court.

E.     Without prejudice to the rights of any other party (but subject to the limitations
described in ordering paragraph 26 below), the Debtors admit that, in accordance with the terms
of the Pre-Petition Loan Documents: (i) the Borrower is truly and justly indebted to the Lender
under the Pre-Petition Credit Agreement, without defense, counterclaim or offset of any kind,
and that as of the Filing Date (a) the Borrower was liable to the Lender in the aggregate principal
amount of approximately $4,917,000 in respect of loans made by the Lender to the Borrower
(and undrawn Letters of Credit) pursuant to the Pre-Petition Credit Agreement (plus attorneys'
fees, costs and interest accrued and unpaid thereon) (the "Pre-Petition Indebtedness"); (ii) as of
the Filing Date, the Debtors, in consideration of the Post-Petition Financing to be made under the

- 5 -

Commitment, waive and release any and all causes of action and claims against the Lender and

its agents, representatives, assigns and successors; and (iii) as of the Filing Date, the Debtors, in

consideration for the use of the Subordinated Secured Lenders' Cash Collateral, waive and

release any and all causes of action and claims against each of the Subordinated Secured Lenders

and their respective agents, representatives, assigns and successors.  The provisions of this

paragraph E constitute a stipulation by the Debtors and not a finding by the Court, subject to the

provisions of ordering paragraph 26 of this Order.

      F.      Without prejudice to the rights of any other party (but subject to the limitations

described in ordering paragraph 26 below), the Debtors further admit that, by reason of the Pre-

Petition Loan Documents, the Pre-Petition Indebtedness is fully secured by enforceable liens and

security interests granted by the Debtors to the Lender, upon and in certain tangible and

intangible assets and property of the Debtors, including, but not limited to, all of the Debtors'

real property, all of the Debtors' tradenames, formulas and recipes, and all of the Debtors' other

assets and property in which a security interest can be obtained under the Uniform Commercial

Code (including the setoff rights described below, the "Pre-Petition Collateral"), including

without limitation, equipment, inventory, accounts receivable, instruments, chattel paper, general

intangibles, contracts and documents of title and the proceeds and products thereof.  The

provisions of this paragraph F constitute a stipulation by the Debtors and not a finding of the

Court, subject to the provisions of ordering paragraph 26 of this Order.

      G.      The holders of claims arising under the Term Loan Agreement (as defined below)

(the "Secured Second Priority Term Loan Holders") and Borrower are party to that certain

Subordinated Term Loan and Security Agreement dated as of June 26, 2003 (as amended,

supplemented or otherwise modified prior to the commencement of these Chapter 11 Cases, the

"Term Loan Agreement") and all collateral and ancillary documents executed in connection

therewith (the "Term Loan Documents"). A true and correct copy of the Term Loan Agreement

and the amendments thereto is attached as Exhibit B to the Appendix to the Motion and

incorporated herein by reference. The provisions of this paragraph G constitute a stipulation by

the Debtors and not a finding by the Court.

      H.     Pursuant to that certain Secured Continuing Unconditional Guaranty dated as of

June 26, 2003, executed by Laura Secord in favor of the Secured Second Priority Term Loan

Holders (the "Parent Term Loan Guaranty") and that certain Guarantee dated as of June 26,

2003, executed by Archibald Canada in favor of the Secured Second Priority Term Loan Holders

(the "Subsidiary Term Loan Guaranty," and together with the Parent Term Loan Guaranty, the

"Term Loan Guaranties"), the Guarantors have unconditionally guaranteed all of Borrower's

Term Loan Indebtedness (as defined below) to the Secured Second Priority Term Loan Holders.

Pursuant to that certain Security Agreement dated as of June 26, 2003, executed by Laura Secord

in favor of the Secured Second Priority Term Loan Holders, that certain General Security

Agreement dated as of June 26, 2003, executed by Archibald Canada in favor of the Secured

Second Priority Term Loan Holders, that certain Movable Hypothec dated June 26, 2003,

executed by Archibald Canada in favor of the Secured Second Priority Term Loan Holders, that

certain Trademark Security Agreement dated as of June 26, 2003, executed by the Borrower and

Laura Secord in favor of the Secured Second Priority Term Loan Holders and that certain

Copyright Security Agreement dated as of June 26, 2003, executed by the Borrower and Laura

Secord in favor of the Secured Second Priority Term Loan Holders (collectively, the "Guarantor

Term Loan Security Agreements"), Guarantors pledged substantially all of their assets to secure

the Obligations (as defined in the Guarantor Term Loan Security Agreements) of the Borrower.

Pursuant to that certain Securities Pledge Agreement dated as of June 26, 2003, executed by

Laura Secord and Borrower in favor of the Secured Second Priority Term Loan Holders and that

certain Securities Pledge Agreement dated as of June 26, 2003, executed by Laura Secord in

favor of the Secured Second Priority Term Loan Holders (collectively, the "Term Loan Pledge

Agreements" and, together with the Guarantor Term Loan Security Agreements and the Term

Loan Guaranties, collectively, the "Guarantor Term Loan Documents"), the Borrower has

pledged the stock of Laura Secord and Laura Secord has pledged the stock of Archibald Canada

to the Secured Second Priority Term Loan Holders and secured the obligations of the Borrower

to the Secured Second Priority Term Loan Holders. The Guarantor Term Loan Documents shall

each be deemed to be Term Loan Documents.  By the signature of Laura Secord's attorney

hereto, Laura Secord (i) acknowledges and confirms that each of the Guarantor Term Loan

Documents to which it is a party continues in full force and effect notwithstanding any financing

and financial accommodations extended by the Secured Second Priority Term Loan Holders to

the Debtors pursuant to the terms of this Order and are ratified and reaffirmed in all respects and

(ii) agrees that all indebtedness, liabilities and obligations of the Debtors to the Secured Second

Priority Term Loan Holders arising from or in connection with the financing and financial

accommodations extended by the Secured Second Priority Term Loan Holders to the Debtors

pursuant to the terms of this Order are unconditionally guaranteed by the Parent Term Loan

Guaranty and secured by the Guarantor Term Loan Security Agreements and the Guarantor

Term Loan Pledge Agreements to which it is a party, notwithstanding anything in such

Guarantor Term Loan Documents to the contrary.  By the Reaffirmation Agreement, Archibald

Canada has (i) acknowledged and confirmed that each of the Guarantor Term Loan Documents

to which it is a party continues in full force and effect notwithstanding any financing and

CH\657231.12

financial accommodations extended by the Secured Second Priority Term Loan Holders to the Debtors pursuant to the terms of this Order and are ratified and reaffirmed in all respects and (ii) agreed that all indebtedness, liabilities and obligations of the Debtors to the Secured Second Priority Term Loan Holders arising from or in connection with the financing and financial accommodations extended by the Secured Second Priority Term Loan Holders to the Debtors pursuant to the terms of this Order are unconditionally guaranteed by the Subsidiary Term Loan Guaranty and secured by the Guarantor Term Loan Security Agreements and the Term Loan Pledge Agreements to which it is a party, notwithstanding anything in such Guarantor Term Loan Documents to the contrary. The provisions of this paragraph H constitute a stipulation by the Debtors and not a finding by the Court.

I.      Without prejudice to the rights of any other party (but subject to the limitations described in ordering paragraph 26 below), the Debtors admit that, in accordance with the terms of the Term Loan Documents:  (i) the Borrower is truly and justly indebted to the Secured Second Priority Term Loan Holders under the Term Loan Agreement, without defense, counterclaim or offset of any kind, and that as of the Filing Date the Borrower was liable to the Secured Second Priority Term Loan Holders in the aggregate principal amount of approximately $21,750,000 in respect of loans made by the Secured Second Priority Term Loan Holders to the Borrower pursuant to the Term Loan Agreement (inclusive of attorneys' fees, costs and interest accrued and unpaid thereon) (the "Term Loan Indebtedness"); (ii) Laura Secord ratifies and reaffirms its guarantee of the Term Loan Indebtedness to the Secured Second Priority Term Loan Holders under the Parent Term Loan Guaranty; (iii) as of the Filing Date, the Debtors, in consideration of the Secured Second Priority Term Loan Holders consent to this Order, waive and release any and all causes of action and claims against the Secured Second Priority Term

- 9 -

Loan Holders and their agents, representatives, assigns and successors; and (iv) as of the Filing

Date, the Debtors, in consideration for the use of the Secured Second Priority Term Loan

Holders' Cash Collateral, waive and release any and all causes of action and claims against each

of the Secured Second Priority Term Loan Holders and their respective agents, representatives,

assigns and successors. The provisions of this paragraph I constitute a stipulation by the Debtors

and not a finding by the Court, subject to the provisions of ordering paragraph 26 of this Order.

      J.      Without prejudice to the rights of any other party (but subject to the limitations

described in ordering paragraph 26 below), the Debtors further admit that, by reason of the Term

Loan Documents, the Term Loan Indebtedness is either fully or partially secured by enforceable

liens and security interests granted by the Debtors to the Secured Second Priority Term Loan

Holders, upon and in certain tangible and intangible assets and property of the Debtors,

including, but not limited to, all of the Debtors' real property, all of the Debtors' tradenames,

formulas and recipes, and all of the Debtors' other assets and property in which a security

interest can be obtained under the Uniform Commercial Code (including the setoff rights

described below, the "Term Loan Collateral"), including without limitation, equipment,

inventory, accounts receivable, instruments, chattel paper, general intangibles, contracts and

documents of title and the proceeds and products thereof. The provisions of this paragraph J

constitute a stipulation by the Debtors and not a finding of the Court, subject to the provisions of

ordering paragraph 26 of this Order.

      K.      BNY Midwest Trust Company, as trustee (the "Indenture Trustee") for the

holders of 10% Secured Subordinated Notes Due 2007 of Borrower arising under the Indenture

(as defined below) (together with the Indenture Trustee, the "Secured Third Priority Note

Holders" and, together with the Secured Second Priority Term Loan Holders and the Indenture

Trustee, the "Subordinated Secured Lenders"), and Borrower are party to that certain Indenture

dated as of November 1, 2002 (as amended, supplemented or otherwise modified prior to the

commencement of these Chapter 11 Cases, the "Indenture") and all collateral and ancillary

documents executed in connection therewith (the "Indenture Documents" and, together with the

Term Loan Documents, the "Subordinated Secured Documents"). A true and correct copy of the

Indenture and the amendments thereto is attached as Exhibit C to the Appendix to the Motion

and incorporated herein by reference. The provisions of this paragraph K constitute a stipulation

by the Debtors and not a finding by the Court.

      L.    Pursuant to that certain Guaranty dated as of November 1, 2002, executed by

Laura Secord in favor of the Indenture Trustee, on behalf of the Secured Third Priority Note

Holders (the "Parent Indenture Guaranty"), and that certain Guarantee and Indemnity dated as of

November 1, 2003, executed by Archibald Canada in favor of the Indenture Trustee, on behalf of

the Secured Third Priority Note Holders (the "Subsidiary Indenture Guaranty," and together with

the Parent Indenture Guaranty, the "Indenture Guaranties"), the Guarantors have unconditionally

guaranteed all of Borrower's Indenture Indebtedness (as defined below) to the Secured Third

Priority Note Holders. Pursuant to that certain Security Agreement dated as of November 1,

2002, executed by the Borrower and Laura Secord in favor of the Indenture Trustee, on behalf of

the Secured Third Priority Note Holders, that certain General Security Agreement dated as of

November 1, 2002, executed by Archibald Canada in favor of the Indenture Trustee, on behalf of

the Secured Third Priority Note Holders, and that certain Deed of Movable Hypothec dated

November 1, 2002, executed by Archibald Canada in favor of the Indenture Trustee, on behalf of

the Secured Third Priority Note Holders, (collectively, the "Guarantor Indenture Security

Agreements"), the Borrower and Guarantors pledged substantially all of their assets to secure the

Obligations (as defined in the Indenture) of the Borrower. Pursuant to that certain Securities

Pledge Agreement dated as of June 26, 2003, executed by Laura Secord and Borrower in favor of

the Indenture Trustee, on behalf of the Secured Third Priority Note Holders and that certain

Securities Pledge Agreement dated as of June 26, 2003, executed by Laura Secord in favor of the

Indenture Trustee, on behalf of the Secured Third Priority Note Holders (collectively, the

"Guarantor Indenture Pledge Agreements" and, together with the Guarantor Indenture Security

Agreements and the Indenture Guaranties, collectively, the "Guarantor Indenture Documents"),

the Borrower has pledged the stock of Laura Secord and Laura Secord has pledged the stock of

Archibald Canada to the Secured Third Priority Note Holders and secured the obligations of the

Borrower to the Secured Third Priority Note Holders. The Guarantor Indenture Documents shall

each be deemed to be Indenture Documents. By the signature of Laura Secord's attorney hereto,

Laura Secord (i) acknowledges and confirms that each of the Guarantor Indenture Documents to

which it is a party continues in full force and effect notwithstanding any financing and financial

accommodations extended by the Secured Third Priority Note Holders to the Debtors pursuant to

the terms of this Order and are ratified and reaffirmed in all respects and (ii) agrees that all

indebtedness, liabilities and obligations of the Debtors to the Secured Third Priority Note

Holders arising from or in connection with the financing and financial accommodations extended

by the Secured Third Priority Note Holders to the Debtors pursuant to the terms of this Order are

unconditionally guaranteed by the Parent Indenture Guaranty and secured by the Guarantor

Indenture Security Agreements and the Guarantor Indenture Pledge Agreement to which it is a

party, notwithstanding anything in such Guarantor Indenture Documents to the contrary. By the

Reaffirmation Agreement, Archibald Canada has (i) acknowledged and confirmed that each of

the Guarantor Indenture Documents to which it is a party continues in full force and effect

CH\657231.12

notwithstanding any financing and financial accommodations extended by the Secured Third

Priority Note Holders to the Debtors pursuant to the terms of this Order and are ratified and

reaffirmed in all respects and (ii) agreed that all indebtedness, liabilities and obligations of the

Debtors to the Secured Third Priority Note Holders arising from or in connection with the

financing and financial accommodations extended by the Secured Third Priority Note Holders to

the Debtors pursuant to the terms of this Order are unconditionally guaranteed by the Subsidiary

Indenture Guaranty and secured by the Guarantor Indenture Security Agreements and the

Guarantor Indenture Pledge Agreement to which it is a party, notwithstanding anything in such

Guarantor Indenture Documents to the contrary.  The provisions of this paragraph L constitute a

stipulation by the Debtors and not a finding by the Court.

      M.     Without prejudice to the rights of any other party (but subject to the limitations

described in ordering paragraph 26 below), the Debtors admit that, in accordance with the terms

of the Indenture Documents:  (i) the Borrower is truly and justly indebted to the Secured Third

Priority Note Holders under the Indenture, without defense, counterclaim or offset of any kind,

and that as of the Filing Date the Borrower was liable to the Secured Third Priority Note Holders

in the aggregate principal amount of approximately $50,000,000 in respect of notes issued by the

Borrower to the Secured Third Priority Note Holders pursuant to the Indenture (plus attorneys'

fees, costs and interest accrued and unpaid thereon) (the "Indenture Indebtedness"); (ii) Laura

Secord ratifies and reaffirms its guarantee of the Indenture Indebtedness to the Secured Third

Priority Note Holders under the Parent Indenture Guaranty; (iii) as of the Filing Date, the

Debtors, in consideration of the Post-Petition Financing to be made under the Commitment,

waive and release any and all causes of action and claims against the Secured Third Priority Note

Holders and their agents, representatives, assigns and successors; and (iv) as of the Filing Date,

- 13 -

the Debtors, in consideration for the use of the Secured Third Priority Note Holders' Cash

Collateral, waive and release any and all causes of action and claims against the Indenture

Trustee and each of the Secured Third Priority Note Holders and their respective agents,

representatives, assigns and successors. The provisions of this paragraph M constitute a

stipulation by the Debtors and not a finding by the Court, subject to the provisions of ordering

paragraph 26 of this Order.

   N.  Without prejudice to the rights of any other party (but subject to the limitations

described in ordering paragraph 26 below), the Debtors further admit that, by reason of the

Indenture Documents, the Indenture Indebtedness is either fully or partially secured by

enforceable liens and security interests granted by the Debtors to the Secured Third Priority Note

Holders, upon and in certain tangible and intangible assets and property of the Debtors,

including, but not limited to, all of the Debtors' real property, all of the Debtors' tradenames,

formulas and recipes, and all of the Debtors' other assets and property in which a security

interest can be obtained under the Uniform Commercial Code (including the setoff rights

described below, the "Indenture Collateral" and, together with the Term Loan Collateral, the

"Subordinated Secured Lenders' Collateral"), including without limitation, equipment,

inventory, accounts receivable, instruments, chattel paper, general intangibles, contracts and

documents of title and the proceeds and products thereof. The provisions of this paragraph N

constitute a stipulation by the Debtors and not a finding of the Court, subject to the provisions of

ordering paragraph 26 of this Order.

   O.  The Lender, the Borrower and the Guarantors are party to or have the express

benefit of the following subordination agreements:  (i) that certain Intercreditor Agreement dated

as of June 26, 2003, among Delaware Street Capital Fund, Ltd. ("DSC"), the Lender, the

- 14 -

Borrower and the Guarantors (the "Term Loan Subordination Agreement") and (ii) the subordination provisions set forth in Article 11 of the Indenture (together with the Term Loan Subordination Agreement, the "Subordination Agreements"). Pursuant to the terms of the Subordination Agreements, all of the subordinated parties pursuant to the Subordination Agreements have been properly notified by the Lender of the existence of certain Events of Default under the Pre-Petition Credit Agreement. By the signature of their attorneys hereto, the Secured Second Priority Term Loan Holders, and the Indenture Trustee, agree that the Subordination Agreements shall continue in full force and effect and apply to all financing and financial accommodations extended by the Lender to the Debtors pursuant to the terms of this Order, notwithstanding anything in the Subordination Agreements to the contrary. As a result, by the signature of their attorneys hereto, the Secured Second Priority Term Loan Holders, and the Indenture Trustee, agree that, notwithstanding anything in the Subordination Agreements to the contrary, it may not ask, demand, sue for, accept or receive, and Borrower may not pay to (i) the Secured Second Priority Term Loan Holders, any payment of any Junior Debt (as defined in the Term Loan Subordination Agreement) or (ii) the Secured Third Priority Note Holders, any payment of any indebtedness evidenced by the Notes (as such terms are defined in the Indenture), in each case, until the Indebtedness (as defined below) is indefeasibly paid in full in cash, the Debtors provide the Lender with cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and the Debtors provide the Lender cash collateral equal to 110% of the undrawn face amount of the Letters of Credit. The provisions of this paragraph O constitute a stipulation by the Debtors and not a finding by the Court.

P.      An ad hoc committee for the Secured Third Priority Note Holders was formed

prior to the filing date (the "Ad Hoc Committee of Secured Third Priority Note Holders") and

retained counsel. Such Secured Third Priority Note Holders and certain other Secured Third

Priority Note Holders, consisting of beneficial holders of at least $48,500,000, or at least 87%, of

all outstanding Indenture Indebtedness, have agreed to the provisions of this Order. The

provisions of this paragraph P constitute a stipulation by the Debtors and not a finding by the

Court.

Q.      The Debtors do not have sufficient available sources of working capital and

financing to carry on the operation of their businesses without the Post-Petition Financing and

the use of the Lender's and the Subordinated Secured Lenders' Cash Collateral. The ability of

the Debtors to finance their winddown operations and fund these Chapter 11 Cases is essential to

the Debtors' ability to consummate the proposed sale of certain of their assets and to sell all of

their assets in an orderly manner. In addition, the Debtors' critical need for financing is

immediate. In the absence of the Post-Petition Financing and such use of the Cash Collateral, the

continued operation and orderly winddown of the Debtors' businesses would not be possible and

serious and irreparable harm to the Debtors and their estates would occur. The preservation,

maintenance and enhancement of the going concern value of the Debtors are of the utmost

significance and importance to the successful, orderly winddown of the operations and sales of

the Debtors' assets under the Bankruptcy Code.

R.      Given the Debtors' current financial condition and capital structure, the Debtors

are unable to obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an

administrative expense. Financing on a post-petition basis is not otherwise available without the

Debtors granting, pursuant to Bankruptcy Code § 364(c)(1), claims having priority over any and

- 16 -

all administrative expenses of the kinds specified in Bankruptcy Code §§ 503(b) and 507(b), other than as described below, and securing such indebtedness and obligations (including undrawn Letters of Credit) with the security interests in and the liens upon the property described below pursuant to Bankruptcy Code §§ 364(c) and (d).

S.        The stay imposed by Bankruptcy Code § 362, and the attendant delay in the ability to exercise nonbankruptcy remedies, as well as the imposition of the priming liens granted to the Lender pursuant to this Order (and, in the case of the Indenture Indebtedness, the priming liens granted to the Secured Second Priority Term Loan Holders), places the Subordinated Secured Lenders at risk of a diminution in value of their collateral during the pendency of these Chapter 11 Cases. Accordingly, adequate protection for the Subordinated Secured Lenders, as set forth in this Order, is appropriate at this time.

T.        Notice of the Final Hearing and the relief requested in the Motion has been given to: (i) the Office of the United States Trustee; (ii) the creditors holding the 20 largest (consolidated) unsecured claims against the Debtors; (iii) counsel to the Lender; (iv) counsel to the Secured Second Priority Term Loan Holders; (v) the Indenture Trustee in its capacity as trustee and in its capacity as registrar for the Secured Third Priority Note Holders; (vi) counsel to the Ad Hoc Committee of Secured Third Priority Note Holders; (vii) the Committee (as defined below); and (viii) all known holders of pre-petition liens against the Debtors' property. An official committee of unsecured creditors (the "Committee") has been appointed in these Chapter 11 Cases and its counsel has been served with the Motion. This Final Hearing was held pursuant to the provisions of Bankruptcy Rule 4001(c)(2).

U.        Based on the record presented to this Court by the Debtors, it appears (and the Debtors, the Lender, the Secured Second Priority Term Loan Holders and the Indenture Trustee

have stipulated and agreed) that the Post-Petition Financing has been negotiated in good faith and at arm's-length between the Debtors and the Lender, and any credit extended and loans made to the Debtors pursuant to this Order shall be deemed to have been extended, issued or made, as the case may be, in good faith as required by, and within the meaning of, Bankruptcy Code § 364(e).

V.    Based on the record before this Court, it appears (and the Debtors, the Lender, the Secured Second Priority Term Loan Holders and the Indenture Trustee have stipulated and agreed) that the terms of this Order, including, without limitation, the terms of the Post-Petition Financing, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

W.    The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2). The permission granted herein to use Cash Collateral and enter into the Post-Petition Financing and obtain funds thereunder is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Order is in the best interests of the Debtors' estates and creditors as its implementation will, among other things, allow for the continued payment of the Debtors' employees and enhance the Debtors' prospects for an orderly winddown of their operations and sale of their assets.

X.    This Order supercedes in its entirety the Interim Order, except to the extent that this Order is reversed, modified, vacated or otherwise amended on appeal or reconsideration, in which case parties are entitled to rely on the Interim Order with respect to matters prior to the date of entry of this Order.

- 18 -

Based upon the foregoing findings, stipulations, and conclusions, and upon the record made before this Court at the Preliminary and Final Hearings, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.      Motion Granted. The Motion is granted, subject to the terms and conditions set forth in this Order.

2.      Authorization. The Debtors are expressly authorized and empowered to: (a) borrow money, use Cash Collateral, and perform their obligations pursuant to the provisions of this Order and (b) enter into such agreements, instruments and documents (collectively, if any, the "DIP Loan Documents") as may be necessary or required to evidence their obligations to the Lender, to consummate the terms and provisions of the Motion and this Order and to evidence perfection of the liens and security interests to be given to the Lender and the Subordinated Secured Lenders pursuant hereto and thereto; provided that such DIP Loan Documents are consistent with this Order. All post-petition loans and all other indebtedness and obligations (including undrawn Letters of Credit) incurred on or after the Filing Date by the Debtors to the Lender pursuant to this Order and the DIP Loan Documents (including principal, accrued and unpaid interest, and costs and expenses) are referred to herein as the "DIP Indebtedness," and, together with the Pre-Petition Indebtedness, as the "Indebtedness."

3.      Borrowing; Use of Cash Collateral. Subject to the terms and conditions of this Order and the DIP Loan Documents (or any amendment thereto agreed to by the Lender that does not materially adversely affect the rights of the Subordinated Secured Lenders hereunder), (a) the Secured Second Priority Term Loan Holders and the Indenture Trustee hereby consent to the Borrower's use of the Lender's and the Subordinated Secured Lenders' Cash Collateral in accordance with the Approved Budget (as defined below) (other than expenditures set forth in

- 19 -

line item "Priority Claims" and "LS Disbursements/Capital" of the Approved Budget, for which either (i) written consent of the Lender, the Secured Second Priority Term Loan Holders and the Indenture Trustee must be obtained or (ii) further order of the Court must be obtained) and the terms of this Order and (b) the Lender hereby consents to the limited use of its Cash Collateral and will make post-petition loans to the Borrower, in each case in an aggregate amount not to exceed the lesser of (i) the Revolving Loan Limit (subject to the reserves set forth in the Pre-Petition Credit Agreement); (ii) 115% of the weekly "Total (Debt)/Cash with LCs" amount specified in the Approved Budget (as defined below) for the applicable weekly period; or (iii) in the aggregate with all Indebtedness, the Commitment. The Cash Collateral and the proceeds of any such post-petition loans shall be used to: (a) pay-off the Pre-Petition Indebtedness as set forth in Paragraph 8 hereto and (b) fund the budgeted expenditures set forth in the Approved Budget in accordance with the provisions of ordering paragraph 15 hereof. Notwithstanding the foregoing, if the Lender in its sole discretion advances funds or other extensions of credit in excess of these limitations (or any other limitations in the DIP Loan Documents), such advances (and any other indebtedness in excess of such amount) shall constitute DIP Indebtedness entitled to the benefits of the DIP Loan Documents and this Order.

4.     Existing Events of Default. Nothing herein or in any of the DIP Loan Documents shall constitute or be deemed to constitute a waiver by the Lender or the Subordinated Secured Lenders of any existing or future Events of Default (including, without limitation, the Events of Default arising from the commencement of these Chapter 11 Cases). Without prejudice to, or waiver of, the Lender's rights and remedies against the Debtors in respect of any Events of Default other than the Existing Defaults (as defined below), the Lender agrees to forbear from foreclosing its liens on any DIP Collateral (as defined below) or otherwise

- 20 -

taking enforcement action against the Debtors or Archibald Canada or any of their respective
assets (other than the delivery to Archibald Canada of a demand for payment and a notice under
section 244 of the Bankruptcy and Insolvency Act (Canada), provided that no further
enforcement or other steps against Archibald Canada shall be taken, and in the event of a sale of
all or substantially all of the assets of Archibald Canada, the Lender shall be entitled to assert all
of its rights with respect to such net sale proceeds) based solely on any Event of Default which
occurred prior to the entry of the Interim Order and of which the Lender had actual knowledge as
of such date (collectively, the "Existing Defaults"); provided that such forbearance shall
terminate upon the earlier of: (a) the occurrence of any Event of Default other than an Existing
Default or (b) the Loan Payment Date (as defined below). In exchange for the adequate
protection granted herein, notwithstanding anything in the Subordination Agreements to the
contrary, the Secured Second Priority Term Loan Holders, the Indenture Trustee and the Secured
Third Priority Note Holders shall be prohibited from exercising any rights or remedies against
the Debtors, Archibald Canada or any of their respective assets (other than the delivery to
Archibald Canada of a demand for payment and a notice under section 244 of the Bankruptcy
and Insolvency Act (Canada), provided that no further enforcement or other steps against
Archibald Canada shall be taken, and in the event of a sale of all or substantially all of the assets
of Archibald Canada, the Subordinated Secured Lenders and the Indenture Trustee shall, subject
to the terms of the Subordination Agreements, be entitled to assert all of their rights with respect
to such net sale proceeds) until indefeasible payment in full in cash of the Indebtedness, the
Lender's receipt of cash collateral in an amount sufficient to satisfy any of the Lender's future
obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and cash
collateralization of 110% of the undrawn face amount of the Letters of Credit. After the

CH\657231.12

indefeasible payment in full in cash of the Indebtedness, the Lender's receipt of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and cash collateralization of 110% of the undrawn face amount of the Letters of Credit, nothing contained in this Order shall impair the rights, if any, of the Subordinated Secured Lenders under § 506(b) of the Bankruptcy Code.

          5.      Interest, Fees, Costs and Expenses.  All Indebtedness shall bear interest as set forth in the Pre-Petition Credit Agreement.  Interest shall be payable monthly in arrears on the last day of each month.  Notwithstanding anything in the Pre-Petition Credit Agreement to the contrary, there shall be no provision for LIBOR-Rate Loans under the Post-Petition Financing.  All fees payable under the Pre-Petition Credit Agreement shall be applicable to the Post-Petition Financing; provided, however, the Letter of Credit fee in the Pre-Petition Credit Agreement shall be increased from 2.5% to 3%.  On a monthly basis, the Lender shall be entitled to recover all of its reasonable out-of-pocket expenses, including an audit expense of $750 per person per day plus any additional out-of-pocket expenses, and including reasonable consultants', attorneys' and paralegals' fees, costs and expenses incurred in connection with the Indebtedness to the extent provided in the Pre-Petition Credit Agreement, subject to disgorgement only pursuant to a final non-appealable order of this Court determining that the fees and expenses incurred and paid were unreasonable.  In consideration for providing the Post-Petition Financing, the Lender will be entitled to recover a $150,000 fee, which was fully earned on the date of the Interim Order, and payable on February 27, 2004.  In addition, the Lender shall be entitled to a $10,000 per month collateral management fee, payable on the last day of each month in arrears until all Indebtedness is indefeasibly paid in full in cash, the Commitment is terminated, the Lender's obligation to fund the Carve-Out is terminated and all Letters of Credit are canceled.

CH\657231.12

6.     Termination of Post-Petition Credit. The Lender's willingness to make

loans hereunder and the Lender's consent to the Debtors' use of Cash Collateral shall

immediately and automatically terminate (except as the Lender may otherwise agree in writing in

its sole discretion), and all Indebtedness other than contingent obligations for undrawn Letters of

Credit shall be immediately due and payable in cash and the Debtors shall be obligated to

immediately provide to the Lender cash collateral equal to 110% of the face amount of all

undrawn Letters of Credit (except as the Lender may otherwise agree in writing in its sole

discretion) upon the earliest to occur of the following (the "Loan Payment Date"):

    (i)     January 28, 2005;

    (ii)    the date of final indefeasible payment and satisfaction in full in
cash of the Indebtedness, the Lender's receipt of cash collateral in an amount sufficient to
satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable
to the Lender and the Debtors, the Lender's receipt of cash collateral in an amount equal
to 110% of the undrawn face amount of the Letters of Credit, and termination of the
Commitment;

    (iii)   the effective date of any confirmed plan in the Chapter 11 Cases;

    (iv)    the consummation of two of the following three sale events:  (a)
the proposed Alpine Sale (as defined below), (b) the sale of the Jackson Property (as
defined below) and (c) the sale of the stock or assets of Archibald Canada;

    (v)     the occurrence of any violation by the Debtors of this Order
(including, but not limited to, the Debtors' failure to adhere to the Approved Budgets as
set forth in ordering paragraph 15 of this Order or violation of the covenants set forth in
ordering paragraph 16 of this Order), or any Event of Default (as defined in the Pre-
Petition Credit Agreement) other than the Existing Defaults;

    (vi)    the dismissal of either of the Chapter 11 Cases or the conversion of
either of the Chapter 11 Cases into a case under Chapter 7 of the Bankruptcy Code;

    (vii)   a trustee or an examiner with enlarged powers (beyond those set
forth in §§ 1106(a)(3) and (4) of the Bankruptcy Code) relating to the operation of either
of the businesses of the Debtors is appointed in the Chapter 11 Cases without the prior
written consent of the Lender (which consent may be withheld in its sole discretion), or
either of the Debtors applies for, consents to, or acquiesces in, any such appointment
without the prior written consent of the Lender (which consent may be withheld in its
sole discretion);

- 23 -

(viii)    this Order is stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the Lender (which consent may be withheld in its sole discretion);

(ix)    this or any other Court enters an order or judgment in either of the Chapter 11 Cases modifying, limiting, subordinating or avoiding the priority of any Indebtedness or the perfection, priority or validity of the Lender's pre-petition or post-petition liens on any DIP Collateral or imposing, surcharging or assessing against the Lender or its claims or any DIP Collateral any costs or expenses, whether pursuant to § 506(c) of the Bankruptcy Code or otherwise, other than as set forth herein;

(x)    other than as set forth herein, the Debtors file any application for approval or allowance of, or any order is entered approving or allowing, any administrative expense claim in either of the Chapter 11 Cases, having any priority over, or being pari passu with, the superadministrative priority of the Indebtedness;

(xi)    an order is entered in either of the Chapter 11 Cases granting relief from the automatic stay of § 362 of the Bankruptcy Code to any holder or holders of a lien on any material collateral allowing such holder or holders to foreclose or otherwise realize upon such liens;

(xii)    any motion or application is filed by or on behalf of the Debtors in either of the Chapter 11 Cases seeking the entry of an order, or an order is entered in either of the Chapter 11 Cases, approving any subsequent debtor-in-possession facility for borrowed money or other extensions of credit unless such subsequent facility and such order expressly provide for the indefeasible payment and complete satisfaction in full in cash to the Lender of all Indebtedness, the payment to the Lender of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors and the payment to the Lender of cash collateral in an amount equal to 110% of the face amount of all undrawn Letters of Credit, prior to, or concurrently with, any initial borrowings or other extensions of credit under such subsequent facility; or

(xiii)    the commencement of any proceedings in bankruptcy by or against Archibald Canada or for the liquidation or reorganization of Archibald Canada, or alleging that Archibald Canada is insolvent or unable to pay its debts as they mature, or for the readjustment or arrangement of Archibald Canada's debts or the application for or appointment of a receiver, receiver-manager or trustee over a substantial portion of the assets of Archibald Canada, whether under the bankruptcy laws of Canada (including, without limitation, the *Companies' Creditors Arrangement Act (Canada)* and/or the *Bankruptcy and Insolvency Act (Canada)*) or similar laws of any foreign jurisdiction, whether state, federal or provincial, now or hereafter existing, for the relief of debtors, or the commencement of any analogous statutory or non-statutory proceedings involving Archibald Canada;

CH\657231.12

provided, however, that upon the satisfaction of the DIP Indebtedness as contemplated in subparagraph (ii) above, the Debtors' authority to use Cash Collateral (except for Cash Collateral held by the Lender) under the remaining applicable terms of this Order shall continue through the effective date of any plan confirmed by the Court, unless otherwise ordered by this Court after notice and a hearing.

      7.    Security for Indebtedness.

      (a)    The Lender is hereby granted as security for the repayment of all amounts of the Lender's Cash Collateral used by the Debtors and for the Indebtedness, pursuant to §§ 363, 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, a valid and perfected first lien, subject only to Prior Claims (as defined below) and the Carve-Out (as defined below), on all present and after-acquired intangible, personal and real property of the Debtors of any nature whatsoever, including, without limitation, all cash contained in any account maintained by the Debtors, all accounts receivable, all inventory, all real property, all tradenames, all recipes, all formulas, all causes of action existing as of the Filing Date and the proceeds thereof, all causes of action against the Lender arising under the Bankruptcy Code including avoidance actions under Bankruptcy Code §§ 544 through 553 inclusive, and proceeds thereof, all claims for relief arising under Bankruptcy Code § 506 and proceeds thereof and all real property, the title to which is held by the Debtors, or possession of which is held by the Debtors pursuant to leasehold interest (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral"). As used herein, the term "Prior Claims" shall mean (i) the pre-petition liens and security interests of the Lender and (ii) any non-avoidable valid, enforceable and perfected liens and security interests in favor of any person or entity on or in the assets of the Debtors, as pre-petition debtors, which existed on the Filing Date and are not subject to § 552(a) of the

- 25 -

CIT\657231.12

Bankruptcy Code, but only to the extent such liens and security interests are superior in priority to the liens and security interests of the Lender, after giving effect to any existing subordination or intercreditor arrangements; provided, however, that notwithstanding the foregoing, Prior Claims shall not include the claims or liens and security interests of the Subordinated Secured Lenders. Other than the first priority liens and security interests in favor of the Lender pursuant to the DIP Loan Documents and this Order, the Prior Claims and the Carve-Out, no other claims, liens or security interests whether prior to or pari passu with the claims, liens or security interests of the Lender shall attach to the DIP Collateral in these or any subsequent or superseding cases (including, without limitation, any conversion of either of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code or any other proceeding related hereto or thereto, collectively, the "Successor Case") without the express written consent of the Lender (which consent may be withheld in its sole discretion). The Lender at its option may release at any time from its liens and security interests any assets determined by the Lender to have a risk of environmental liabilities which the Lender in its sole discretion deems unacceptable. In addition, except to the extent otherwise expressly set forth in this Order, or in a written instrument, agreement or other document executed by one or more duly authorized representatives of the Lender, no liens or security interests granted to the Lender, and no claim of the Lender, shall be subject to subordination to any other liens, security interests or claims under § 510 of the Bankruptcy Code or otherwise. Any security interest or lien upon the DIP Collateral which is avoided or otherwise preserved for the benefit of any Debtor's estate under § 551 or any other provision of the Bankruptcy Code shall be subordinate to the security interests in and liens of the Lender upon the DIP Collateral. The Lender shall be entitled to all of the rights accorded to it pursuant to §507(b) of the Bankruptcy Code.

(b)     All Cash Collateral of the Lender used by the Debtors which does

not constitute Indebtedness and all DIP Indebtedness shall be deemed to be part of the Liabilities

(as defined in the Pre-Petition Credit Agreement), as well as obligations and indebtedness of the

Debtors hereunder.

(c)     To the extent of any diminution in the value of the Pre-Petition

Collateral, the Secured Second Priority Term Loan Holders are hereby granted as security,

pursuant to §§ 361, 363 and 364 of the Bankruptcy Code, a valid and perfected lien on the DIP

Collateral, subject and junior only to Prior Claims, the Lender's liens on the DIP Collateral

granted hereby and the Carve-Out. Other than the first priority liens and security interests in

favor of the Lender pursuant to the DIP Loan Documents and this Order, the Prior Claims and

the Carve-Out, no other claims, liens or security interests whether prior to or pari passu with the

claims, liens or security interests of the Secured Second Priority Term Loan Holders shall attach

to the DIP Collateral in these Chapter 11 Cases or any Successor Case without the express

written consent of the Secured Second Priority Term Loan Holders (which consent may be

withheld in their sole discretion). The Secured Second Priority Term Loan Holders, at their

option, may release at any time from their liens and security interests any assets determined by

the Secured Second Priority Term Loan Holders to have a risk of environmental liabilities, which

the Secured Second Priority Term Loan Holders in their sole discretion deem unacceptable. In

addition, except to the extent otherwise expressly set forth in this Order, or in a written

instrument, agreement or other document executed by one or more duly authorized

representatives of the Secured Second Priority Term Loan Holders, no liens or security interests

granted to the Secured Second Priority Term Loan Holders, and no claim of the Secured Second

Priority Term Loan Holders, shall be subject to subordination to any other liens, security

CH\657231.12

interests or claims under § 510 of the Bankruptcy Code or otherwise. Any security interest or lien upon the DIP Collateral which is avoided or otherwise preserved for the benefit of any Debtor's estate under § 551 or any other provision of the Bankruptcy Code shall be subordinate to the security interests in and liens of the Secured Second Priority Term Loan Holders upon the DIP Collateral. The Secured Second Priority Term Loan Holders shall be entitled to all of the rights accorded to it pursuant to § 507(b) of the Bankruptcy Code. All rights granted to the Secured Second Priority Term Loan Holders in this Order are subject to the Subordination Agreements.

(d)    To the extent of any diminution in the value of the Pre-Petition Collateral, the Secured Third Priority Note Holders are hereby granted as security, pursuant to §§ 361, 363 and 364 of the Bankruptcy Code, a valid and perfected lien on the DIP Collateral, subject and junior only to Prior Claims, the Lender's and the Secured Second Priority Term Loan Holders' liens on the DIP Collateral granted hereby and the Carve-Out. Other than the first priority liens and security interests in favor of the Lender pursuant to the DIP Loan Documents and this Order, the second priority liens and security interests in favor of the Secured Second Priority Term Loan Holders pursuant to this Order, the Prior Claims and the Carve-Out, no other claims, liens or security interests whether prior to or pari passu with the claims, liens or security interests of the Secured Third Priority Note Holders shall attach to the DIP Collateral in these Chapter 11 Cases or any Successor Case without the express written consent of the Secured Third Priority Note Holders (which consent may be withheld in their sole discretion). The Secured Third Priority Note Holders, at their option, may release at any time from their liens and security interests any assets determined by the Secured Third Priority Note Holders to have a risk of environmental liabilities, which the Secured Third Priority Note Holders in their sole

- 28 -

discretion deem unacceptable. In addition, except to the extent otherwise expressly set forth in this Order, or in a written instrument, agreement or other document executed by one or more duly authorized representatives of the Secured Third Priority Note Holders, no liens or security interests granted to the Secured Third Priority Note Holders and no claim of the Secured Third Priority Note Holders shall be subject to subordination to any other liens, security interests or claims under § 510 of the Bankruptcy Code or otherwise. Any security interest or lien upon the DIP Collateral which is avoided or otherwise preserved for the benefit of any Debtor's estate under § 551 or any other provision of the Bankruptcy Code shall be subordinate to the security interests in and liens of the Secured Third Priority Note Holders upon the DIP Collateral. The Secured Third Priority Note Holders shall be entitled to all of the rights accorded to it pursuant to § 507(b) of the Bankruptcy Code. All rights granted to the Secured Third Priority Note Holders in this Order are subject to the Subordination Agreements.

(e)     As further adequate protection for the Term Loan Indebtedness and after the indefeasible payment in full in cash of the Indebtedness, the Lender's receipt of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and cash collateralization of 110% of the undrawn face amount of the Letters of Credit (collectively, the "Term Loan Adequate Protection Triggers"): (1) the Debtors shall pay the fees and expenses of professionals and advisors retained by the Secured Second Priority Term Loan Holders, within 20 days after the monthly presentation of invoices (copies of which shall be delivered to any Committee appointed in the Chapter 11 Cases) and (2) any such professional shall be entitled to apply any retainers that they hold to pay any such fees and expenses, whether incurred pre- or post-petition, and the automatic stay of Bankruptcy Code § 362 is hereby modified to permit such setoff;

- 29 -

provided, however, that prior to the satisfaction of the Term Loan Adequate Protection Triggers, the Debtors may make the payments provided in clauses (1) and (2) above only to the extent permissible under the Approved Budget and only to the extent that such payments do not result in a default under the Approved Budget or this Order. The payment of such fees and expenses after satisfaction of the Term Loan Adequate Protection Triggers shall not, whether or not such amounts are included in the Approved Budget, give rise to an Event of Default under the DIP Loan Documents, the Prepetition Loan Documents or the Term Loan Documents, including this Order. Professionals retained by the Secured Second Priority Term Loan Holders shall not be required to file interim or final fee applications with this Court. Such fees and expenses shall be subject to disgorgement only pursuant to a final non-appealable order of this Court determining that the fees and expenses incurred and paid were reasonable.

(f)    As further adequate protection for the Indenture Indebtedness and after (i) the indefeasible payment in full in cash of the Indebtedness, the Lender's receipt of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and cash collateralization of 110% of the undrawn face amount of the Letters of Credit and (ii) the indefeasible payment in full of the Term Loan Indebtedness (collectively, the "Indenture Adequate Protection Triggers"): (1) the Debtors shall pay the fees and expenses of professionals and advisors retained by the Ad Hoc Committee of Secured Third Priority Note Holders and the Indenture Trustee, within 20 days after the monthly presentation of invoices (copies of which shall be delivered to any Committee appointed in the Chapter 11 Cases) and (2) any such professional shall be entitled to apply any retainers that they hold to pay any such fees and expenses, whether incurred pre- or post-petition, and the automatic stay of Bankruptcy Code § 362 is hereby modified to permit

- 30 -

such setoff; provided, however, that prior to the satisfaction of the Indenture Adequate Protection

Triggers, the Debtors may make the payments provided in clauses (1) and (2) above only to the

extent permissible under the Approved Budget and only to the extent that such payments do not

result in a default under the Approved Budget or this Order. The payment of such fees and

expenses after satisfaction of the Indenture Adequate Protection Triggers shall not, whether or

not such amounts are included in the Approved Budget, give rise to an Event of Default under

the DIP Loan Documents, the Prepetition Loan Documents, the Term Loan Documents or the

Indenture Documents, including this Order. Professionals retained by the Ad Hoc Committee of

Secured Third Priority Note Holders and the Indenture Trustee shall not be required to file

interim or final fee applications with this Court. Such fees and expenses shall be subject to

disgorgement only pursuant to a final non-appealable order of this Court determining that the

fees and expenses incurred and paid were reasonable.

(g)    As further adequate protection for the Subordinated Secured

Lenders, after the application of any proceeds of Pre-Petition Collateral or DIP Collateral in

accordance with paragraph 17 hereof, and subject to the occurrence of the Term Loan Adequate

Protection Triggers, (i) all proceeds of Pre-Petition Collateral and DIP Collateral that secure any

of the Term Loan Indebtedness shall be applied to pay such indebtedness and (ii) further subject

to the occurrence of the Indenture Adequate Protection Triggers, all proceeds of Pre-Petition

Collateral and DIP Collateral that secure any of the Indenture Indebtedness shall be immediately

applied to pay such indebtedness. The automatic stay is hereby modified to permit such

payments.

(h)    As part of the protections of this Order, the Subordination

Agreements shall continue in full force and effect and apply to all financing and financial

- 31 -

accommodations extended by the Lender to the Debtors pursuant to the terms of this Order, notwithstanding anything in the Subordination Agreements to the contrary. Notwithstanding anything in the Subordination Agreements to the contrary, the Subordinated Secured Lenders may not ask, demand, sue for, accept or receive, and Borrower may not pay to the Subordinated Secured Lenders, any payment of any Junior Debt (as defined in the Term Loan Subordination Agreement) or indebtedness evidenced by the Notes (as defined in the Indenture) until the Indebtedness is indefeasibly paid in full in cash, the Debtors provide the Lender with cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and the Debtors provide the Lender cash collateral equal to 110% of the undrawn face amount of the Letters of Credit.

8.     Payoff of Pre-Petition Indebtedness.

The proceeds of the Post-Petition Financing shall be deemed to have been used to pay off the Pre-Petition Indebtedness in its entirety upon signing of the Interim Order and all Pre-Petition Indebtedness shall be replaced and refinanced by, and become, DIP Indebtedness. Without limiting the foregoing, the Debtors' obligations to reimburse the Lender for draws on Letters of Credit issued prior to the Filing Date shall be and become part of the DIP Indebtedness and such Letters of Credit shall be deemed to have been issued hereunder.

9.     Perfection of New Liens. All liens and security interests on or in the DIP Collateral granted to the Lender and the Subordinated Secured Lenders by this Order or by the DIP Loan Documents shall be, and they hereby are, deemed duly perfected and recorded under all applicable federal or state or other laws as of the date hereof, and no notice, filing, mortgage recordation, possession, further order, landlord or warehousemen lien waivers or other third party consents or other act, shall be required to effect such perfection; provided, however, that

- 32 -

notwithstanding the provisions of § 362 of the Bankruptcy Code, (i) the Lender (or any Subordinated Secured Lender) may, at its sole option, file or record or cause the Debtors to obtain any such landlord or warehousemen lien waivers or other third party consents or execute, file or record, at the Debtors' expense, any such UCC financing statements, notices of liens and security interests, mortgages and other similar documents as the Lender may require, and (ii) the Lender may require the Debtors to deliver to the Lender any chattel paper, instruments or securities evidencing or constituting any DIP Collateral, and the Debtors are directed to cooperate and comply therewith. If the Lender (or any Subordinated Secured Lender), in its sole discretion, shall elect for any reason to cause to be obtained any landlord or warehouse lien waivers or other third party consents or cause to be filed or recorded any such notices, financing statements, mortgages or other documents with respect to such security interests and liens, or if the Lender, in accordance with the DIP Loan Documents, shall elect to take possession of any DIP Collateral, all such landlord or warehouse lien waivers or other third party consents, financing statements or similar documents or taking possession shall be deemed to have been filed or recorded or taken in these Chapter 11 Cases as of the commencement of these Chapter 11 Cases but with the priorities as set forth herein. The Lender (or any Subordinated Secured Lender) may (in its discretion) but shall not be required to, file a certified copy of this Order in any filing or recording office in any county or other jurisdiction in which the Debtors have real or personal property and such filing or recording shall be accepted and shall constitute further evidence of perfection of the Lender's (or such Subordinated Secured Lender's) interests in the DIP Collateral.

    10.    Waiver.

(a)     The Debtors and their estates (and any party in interest acting on behalf of the Debtors) hereby irrevocably waive, and are barred from asserting or exercising any right, (a) without the Lender's prior written consent (which may be withheld in its sole discretion), or (b) without prior indefeasible payment and satisfaction in full in cash of the Indebtedness, the Lender's receipt of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and the Lender's receipt of cash collateral in an amount equal to 110% of the undrawn face amount of the Letters of Credit: (i) to grant or impose, or request that the Court grant or impose, under § 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP Collateral, which are pari passu with or superior to the Lender's liens on and security interests in such DIP Collateral; (ii) to return goods pursuant to § 546(g) of the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise; or (iii) to modify or affect any of the rights of the Lender under this Order or any DIP Loan Documents by any order entered in either of the Chapter 11 Cases or any Successor Case.

(b)     From and after indefeasible payment and satisfaction in full in cash of the Indebtedness, payment to the Lender of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and payment to the Lender of cash collateral in an amount equal to 110% of the face amount of undrawn Letters of Credit, the Debtors and their estates (and any party in interest acting on behalf of the Debtors) shall irrevocably waive, and be barred from asserting or exercising any right, (a) without the Secured Second Priority Term Loan Holders' prior written

CH\657231.12

consent (which may be withheld in their sole discretion), or (b) without prior indefeasible

payment and satisfaction in full in cash of the Term Loan Indebtedness: (i) to grant or impose, or

request that the Court grant or impose, under § 364 of the Bankruptcy Code or otherwise, liens

on or security interests in any DIP Collateral, which are pari passu with or superior to the

Secured Second Priority Term Loan Holders' liens on and security interests in such DIP

Collateral; (ii) to return goods pursuant to § 546(g) of the Bankruptcy Code to any creditor of the

Debtors or to consent to any creditor taking any setoff against any of such creditor's pre-petition

indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or

otherwise; or (iii) to modify or affect any of the rights of the Secured Second Priority Term Loan

Holders under this Order or any DIP Loan Documents by any order entered in either of the

Chapter 11 Cases or any Successor Case.

(c)     From and after indefeasible payment and satisfaction in full in cash

of the Indebtedness, payment to the Lender of cash collateral in an amount sufficient to satisfy

any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender

and the Debtors, and payment to the Lender of cash collateral in an amount equal to 110% of the

face amount of undrawn Letters of Credit, and indefeasible payment in full in cash of the Term

Loan Indebtedness, the Debtors and their estates (and any party in interest acting on behalf of the

Debtors) shall irrevocably waive, and be barred from asserting or exercising any right, (a)

without the Secured Third Priority Note Holders' prior written consent (which may be withheld

in their sole discretion), or (b) without prior indefeasible payment and satisfaction in full in cash

of the Indenture Indebtedness: (i) to grant or impose, or request that the Court grant or impose,

under § 364 of the Bankruptcy Code or otherwise, liens on or security interests in any DIP

Collateral, which are pari passu with or superior to the Secured Third Priority Note Holders'

- 35 -

liens on and security interests in such DIP Collateral; (ii) to return goods pursuant to § 546(g) of

the Bankruptcy Code to any creditor of the Debtors or to consent to any creditor taking any

setoff against any of such creditor's pre-petition indebtedness based upon any such return

pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise; or (iii) to modify or affect any of

the rights of the Secured Third Priority Note Holders under this Order or any DIP Loan

Documents by any order entered in either of the Chapter 11 Cases or any Successor Case.

11.   Modification of Automatic Stay; Other Remedies.

(a)   Except as set forth in subparagraph (b) of this paragraph, which

governs any action by the Lender and the Subordinated Secured Lenders to foreclose on their

liens on any DIP Collateral or to exercise any other default-related remedies (other than those

specifically referenced in the next sentence), the automatic stay pursuant to § 362 of the

Bankruptcy Code is hereby vacated as to the Lender and the Subordinated Secured Lenders to

permit them to perform in accordance with, and exercise, enjoy and enforce their rights, benefits,

privileges and remedies pursuant to this Order and the other DIP Loan Documents without

further application or motion to, or order from, the Court, and regardless of any change in

circumstances (whether or not foreseeable), neither § 105 of the Bankruptcy Code nor any other

provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the Lender's and

the Subordinated Secured Lenders' exercise, enjoyment and enforcement of any of such rights,

benefits, privileges and remedies. The Lender is hereby granted leave, among other things, to (a)

receive and apply payments of the Indebtedness and collections on and proceeds of the Pre-

Petition Collateral and the DIP Collateral to the Indebtedness in the manner specified in this

Order and the DIP Loan Documents, (b) file or record any financing statements, mortgages or

other instruments or other documents to evidence the security interests in and liens upon the DIP

- 36 -

Collateral, (c) to the extent permitted by § 506(b) of the Bankruptcy Code, charge and collect any interest, fees, costs, and expenses and other amounts accruing at any time under the DIP Loan Documents or this Order as provided therein, (d) to give the Debtors any notice provided for in any of the DIP Loan Documents or this Order and (e) upon the occurrence of an Event of Default other than any Existing Default, or upon the Loan Payment Date, and without application or motion to, or order from the Court or any other court, (i) cease making loans or other extensions of credit and/or suspend or terminate any obligation of the Lender to make loans or other extensions of credit, (ii) terminate the Pre-Petition Credit Agreement and the Post-Petition Financing under this Order and the other DIP Loan Documents, (iii) declare all Indebtedness immediately due and payable, and require that all contingent Indebtedness (if any) be cash collateralized or terminated without liability to the Lender, and (iv) revoke the Debtors' rights, if any, under this Order and/or the other DIP Loan Documents to use the Lender's Cash Collateral.

(b)     Upon the occurrence of any Event of Default other than any Existing Defaults, or upon the Loan Payment Date, the Lender shall be entitled (i) to file an emergency motion for relief from the automatic stay for the purpose of foreclosing or otherwise enforcing its liens on any or all of the DIP Collateral and/or to exercise any other default-related remedies under the DIP Loan Documents, this Order or applicable law, and (ii) to obtain an expedited hearing on such motion upon five (5) days' notice to counsel for the Debtors, counsel for any Committee, counsel for Secured Second Priority Term Loan Holders, Don S. DeAmicis, Ropes & Gray, One International Place, Boston, Massachusetts 02110, counsel to the Ad Hoc Committee for the Secured Third Priority Note Holders, counsel for the Indenture Trustee and the U.S. Trustee. The Lender shall be entitled to such relief from the automatic stay upon a showing only that one or more Events of Default (other than any Existing Default) have occurred

and are then continuing or that the Loan Payment Date has occurred. Upon the entry of an order

granting the Lender relief from the automatic stay to enforce its liens or to exercise any other

default-related remedies, the Lender may exercise any remedies available to the Lender under

this Order, the Pre-Petition Credit Agreement and other Pre-Petition Loan Documents or

applicable law, including to foreclose on the Pre-Petition Collateral and the DIP Collateral.

          12.    <u>Priority Claims; No 506(c) Charges</u>. Subject to the Carve-Out described

in ordering paragraph 13 below, the Indebtedness shall have the highest administrative priority

under § 364(c)(1) of the Bankruptcy Code, and shall have priority over all other costs and

expenses of administration of any kind, including those specified in, or ordered pursuant to,

§§ 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b) or 726 or any other provision of the

Bankruptcy Code or otherwise (whether incurred in either of the Chapter 11 Cases or any

Successor Case), and shall at all times be senior to the rights of the Debtors, any successor

trustee or estate representatives in either of the Chapter 11 Cases or any Successor Case. No

costs or expenses of administration or other charge, lien, assessment or claim incurred at any

time (including, without limitation, any expenses set forth in any Approved Budget or any other

budget) by any person or entity shall be imposed against the Lender or the Subordinated Secured

Lenders, their claims, or their collateral under § 506(c) of the Bankruptcy Code or otherwise,

unless, prior to incurring such costs or expenses the party proposing to incur such cost or

expense shall obtain the written consent of the Lender and the Subordinated Secured Lenders

allowing such charge to be imposed against such persons, their claims or their collateral under

§ 506(c) of the Bankruptcy Code. Nothing in this Order or the Approved Budget or any other

budget shall constitute the consent by the Lender or the Subordinated Secured Lenders to the

imposition of any costs or expense of administration or other charge, lien, assessment or claim

(including, without limitation, any amounts set forth in the Approved Budget or any other budget) against the Lender or the Subordinated Secured Lenders, their claims or their collateral under § 506(c) of the Bankruptcy Code or otherwise.

13.    Carve-Out.

(a)    Notwithstanding any contrary provision of this Order, the Lender's and the Subordinated Secured Lenders' liens on and security interests in the DIP Collateral and their administrative claims under § 364(c)(1) and 507(b) of the Bankruptcy Code shall be subject only to (i) prior to the occurrence of a Loan Payment Date or Event of Default other than an Existing Default (a "Carve-Out Event"), unpaid professional fees and disbursements for which fee statements are filed in accordance with Court approved compensation orders and served on the Lender, the Secured Second Priority Term Loan Holders and the Ad Hoc Committee for the Secured Third Priority Note Holders prior to the occurrence of a Carve-Out Event by (A) the professionals retained, pursuant to sections 327 of the Bankruptcy Code, by the Debtors (the "Debtors' Professionals") and (B) the professionals retained pursuant to section 1103(a) of the Bankruptcy Code by any statutory committee appointed in the Chapter 11 Cases (the "Committee Professionals"); provided, that the Carve-Out for the Committee Professionals shall not, prior to the occurrence of a Carve-Out Event, exceed the sum of $50,000 plus $69,200 that was paid to the Debtors by Paragon Capital Partners, LLC and deposited into a segregated account; if and to the extent such fees and expenses are approved and allowed by this Court pursuant to sections 330 and 331 of the Bankruptcy Code; plus (ii) following the occurrence of a Carve-Out Event, the payment of allowed professional fees and disbursements incurred prior to or after the occurrence of a Carve-Out Event for which no fee statements were filed in accordance with Court approved compensation orders prior to the occurrence of a Carve-Out

CH\657231.12

Event by the professionals retained, pursuant to sections 327 or 1103(a) of the Bankruptcy Code, by the Debtors and any statutory committee appointed in the Chapter 11 Cases, in an aggregate amount not to exceed (x)(1) with respect to the Committee Professionals the remainder of the $50,000 amount not utilized prior to the occurrence of a Carve-Out Event plus (2) with respect to the Debtors' Professionals, $250,000 less (y) the aggregate amount of all retainers paid prior to the Filing Date that have not been applied against allowed fees as of a Carve-Out Event; plus (iii) quarterly fees required to be paid pursuant to 28 U.S.C. § 1930(a)(6) and any fees payable to the Clerk of the Bankruptcy Court and any agent thereof (collectively, clauses (i), (ii) and (iii), the "Carve-Out"). The Debtors' Professionals and Committee Professionals are hereby directed to first utilize retainers, if any, to pay allowed fees, until exhausted, prior to seeking payment of allowed fees from the Debtors. Upon satisfaction of the DIP Indebtedness as contemplated in ordering subparagraph 6(ii) above, the Subordinated Secured Lenders' liens on and security interests in the DIP Collateral and in the Cash Collateral shall continue to be subject to the Carve-Out through the effective date of any plan confirmed by the Court, unless otherwise ordered by this Court after notice and a hearing. Nothing in this Order shall constitute a cap or limit on fees or expenses any Debtor Professionals or Committee Professionals may seek to have paid; provided, however, that any amounts paid in excess of the Carve-Out shall be paid from unencumbered assets of the estate.

(b)     Notwithstanding anything to the contrary in this Order or the DIP Loan Documents, the pre-petition and post-petition liens and security interests and the administrative priority claims of the Lender shall be senior to, and no proceeds of Indebtedness or Cash Collateral (including any pre-petition retainer funded by the Lender pursuant to the Pre-Petition Loan Documents) nor any Pre-Petition Collateral or DIP Collateral (or proceeds thereof) may be

used to pay, any and all claims for services rendered by any of the Debtors' Professionals or the Committee Professionals in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration or similar relief: (x) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Indebtedness or the liens and security interests of the Lender or the Subordinated Secured Lenders in the Pre-Petition Collateral or the Subordinated Secured Lenders' Collateral or the DIP Collateral; or (y) preventing, hindering or otherwise delaying, whether directly or indirectly, the exercise by the Lender or the Subordinated Secured Lenders of any of their rights and remedies under the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, the Subordinated Secured Documents, this Order and/or the DIP Loan Documents or the Lender's enforcement or realization upon any of the liens on or security interests in any Pre-Petition Collateral, the Subordinated Secured Lenders' Collateral or DIP Collateral. The Lender and the Subordinated Secured Lenders shall retain their rights as parties in interest to object to any claims of any of the Debtors' Professionals and the Committee Professionals. Upon satisfaction of the DIP Indebtedness as contemplated in ordering subparagraph 6(ii) above, the provisions of this ordering subparagraph 13(b) shall continue (including with respect to any claims, counterclaims, actions, proceedings, applications, motions, objections, defenses or other contested matters involving the Lender) through the effective date of any plan confirmed by the Court unless otherwise ordered by this Court after notice and a hearing.

14.    Cash Collection Procedures. From and after the date of the entry of this Order all collections and proceeds of any DIP Collateral or services provided by the Debtors and

all other cash or cash equivalents which shall at any time come into the possession or control of

the Debtors, or to which the Debtors shall become entitled at any time shall be deposited in the

same bank accounts into which the collections and proceeds of the Pre-Petition Collateral were

deposited under the Pre-Petition Credit Agreement (or in such other accounts as are designated

by the Lender from time to time), and such collections and proceeds upon such deposit shall

become the sole and exclusive property of the Lender and shall be applied against the

Indebtedness as provided in this Order. All cash and cash equivalents of the Debtors currently in

any account of the Debtors or otherwise in the possession or control of the Debtors constitutes

proceeds of the Pre-Petition Collateral and shall be immediately remitted to the Lender for

application against the Indebtedness. All financial institutions in which any lockboxes, blocked

accounts or other accounts of the Debtors are located are hereby authorized and directed to

comply with any request of the Lender to turnover to the Lender all funds therein without offset

or deduction of any kind.

    15. <u>Budget; Use of Loan and Collateral Proceeds</u>. Attached as <u>Exhibit 2</u>

hereto and incorporated herein by reference is a budget (which has been approved by the Lender)

setting forth by line item all projected cash receipts and cash disbursements for the time period

from January 27, 2004 through August 28, 2004 (the "<u>Initial Approved Budget</u>"). The Initial

Approved Budget may be modified or supplemented from time to time by additional budgets

(covering any time period covered by a prior budget or covering additional time periods) to

which the Lender and the Debtors agree in their respective sole discretion (each such additional

budget, a "<u>Supplemental Approved Budget</u>"). The aggregate of all items approved by the Lender

in the Initial Approved Budget and any and all Supplemental Approved Budgets (acceptable to

the Lender in its discretion) shall constitute an "Approved Budget." The Debtors' aggregate

cumulative expenditures for the period from the Filing Date through the end of any week shall

not exceed one hundred ten percent (110%) of the aggregate cumulative budgeted amount for

such cumulative period. Within three (3) Business Days after each week, the Debtors shall

provide the Lender (with a copy to counsel for the Secured Second Priority Term Loan Holders

and counsel for the Ad Hoc Committee for the Secured Third Priority Note Holders) with a

statement comparing actual cash receipts with budgeted cash receipts for the period from the

Filing Date through the end of such week and comparing actual expenditures with budgeted

expenditures for the period from the Filing Date through the end of such week by line item and

in the aggregate. Except as otherwise provided in ordering paragraphs 8, 17 and 18 hereof, the

proceeds of any loans or other extensions of credit made by the Lender to the Borrower pursuant

to this Order and the DIP Loan Documents, all proceeds of DIP Collateral, all proceeds of Pre-

Petition Collateral and all Cash Collateral shall be used only as follows: (a) prior to the Loan

Payment Date, for the payment of the expenses set forth in any Approved Budget (subject to the

limitations and exceptions set forth in this ordering paragraph), any fees and expenses of the

Debtors' Professionals and the Committee Professionals (to the extent of any unused portion of

the Carve-Out), and any portion of the Indebtedness, and (b) on or after the Loan Payment Date,

first for the payment of any amounts constituting any part of the unused Carve-Out, second, for

indefeasible payment in full in cash of the Indebtedness, payment to the Lender of cash collateral

in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a

manner acceptable to the Lender and the Debtors, and payment to the Lender of cash collateral in

an amount equal to 110% of the face amount of undrawn Letters of Credit, and third, upon

payment in full thereof in cash, then for the payment of the fees and expenses set forth in

paragraphs 7(e) and (f) hereof and any allowed administrative expenses or other claims in

- 43 -

accordance with the provisions of the Bankruptcy Code and orders of this Court (including any

expenses which remain unpaid as of the Loan Payment Date, but were authorized by the

Approved Budget and incurred prior to the Loan Payment Date); provided, however, that upon

the satisfaction of the DIP Indebtedness as contemplated by subparagraph 6(ii) above, the

Debtors' authority to use Cash Collateral (except for Cash Collateral held by the Lender) under

the remaining applicable terms of this Order shall continue through the effective date of any plan

confirmed by this Court, unless otherwise ordered by this Court after notice and a hearing.  The

Lender shall have no obligation with respect to the Debtors' use of the proceeds of the Post-

Petition Financing, the DIP Collateral or Cash Collateral, and shall not be obligated to ensure or

monitor the Debtors' compliance with any Approved Budget or to pay (directly or indirectly

from its DIP Collateral) any expenses incurred or authorized to be incurred pursuant to the

Approved Budget.  Funds borrowed under this Order and Cash Collateral used under this Order

shall be used by the Debtors in accordance with this Order.  The Lender's consent to any

Approved Budget shall not be construed as a consent to the use of any Cash Collateral or a

commitment to continue to provide Post-Petition Financing after the occurrence of an Event of

Default (other than the Existing Defaults) or beyond the Loan Payment Date, regardless of

whether the aggregate funds shown on the Approved Budget have been expended.  To induce the

Lender and the Subordinated Secured Lenders to permit the Borrower to use Cash Collateral and

borrow additional funds, the Debtors have agreed, and this Court hereby orders, that as long as

any Indebtedness is outstanding, the Debtors shall not seek, assert, argue for, encourage or

support the use of Cash Collateral of the Lender or the Subordinated Secured Lenders by the

Debtors except as expressly permitted and consented to by the Lender and the Subordinated

Secured Lenders pursuant to the terms of this Order (or any amendment hereto agreed to by the Lender that does not materially adversely affect the rights of the Subordinated Secured Lenders).

16.     Covenants. The Debtors shall timely comply with all of the covenants set forth in the Pre-Petition Credit Agreement, the Pre-Petition Loan Documents, this Order and the other DIP Loan Documents. In addition, the Debtors hereby covenant and agree:

(a)     On or prior to February 28, 2004, the Debtors shall have filed a motion for the retention of a real estate broker to sell 1137 West Jackson Boulevard, Chicago, Illinois (the "Jackson Property");

(b)     On or prior to March 31, 2004, the Debtors shall have filed a motion for the retention of an auctioneer to sell the machinery and equipment located at the Jackson Property;

(c)     On or prior to May 31, 2004, the Debtors shall have closed the sale of all of the assets described in the Alpine Asset Purchase Agreement attached as Exhibit E to the Appendix to the Motion (the "Alpine Assets") and paid the proceeds thereof to the Lender (which proceeds shall be at least $13 million) (the "Alpine Sale");

(d)     On or prior to June 30, 2004, the Debtors shall have closed the sale of the machinery and equipment located at the Jackson Property and paid the proceeds thereof to the Lender; and

(e)     On Wednesday of each week, the Debtors shall provide the Lender and the Subordinated Secured Lenders with a written progress report regarding the sale of the Jackson Property, the machinery and equipment located at the Jackson Property and the Alpine Assets.

17.     Application of Collateral Proceeds. All proceeds of Pre-Petition Collateral and DIP Collateral sold in the ordinary course of business, shall be applied to the Indebtedness

- 45 -

(in such order as determined by the Lender in its sole discretion) and may be reborrowed. The Debtors shall not have the right to direct the manner of application of any payments to the Lender or any other receipts by the Lender of proceeds of any of the Pre-Petition Collateral or DIP Collateral other than in the manner set forth in this ordering paragraph or ordering paragraph 18.

18.    <u>Non-Ordinary Course Dispositions</u>.  No sale, lease or other disposition of Pre-Petition Collateral or DIP Collateral outside the ordinary course of business (including any auction or other similar sales) may be done without the Lender's written consent and, after indefeasible payment in full in cash of the Indebtedness, the Lender's receipt of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, the Lender's receipt of cash collateral in an amount equal to 110% of the undrawn face amount of the Letters of Credit, the consent of the Secured Second Priority Term Loan Holders; <u>provided</u>, <u>however</u>, that the Lender and the Secured Second Priority Term Loan Holders hereby consent to the sale of the Alpine Assets on the exact terms set forth in the Alpine Asset Purchase Agreement, a copy of which without the voluminous exhibits and schedules thereto is attached as <u>Exhibit E</u> to the Appendix to the Motion; and <u>provided</u>, <u>further</u>, that the Lender and the Secured Second Priority Term Loan Holders hereby consent to the sale of up to $1,000,000 of book value of inventory and equipment in the aggregate without the need for further consents hereunder.  All proceeds of Pre-Petition Collateral and DIP Collateral, from any sale, lease or other disposition of any Pre-Petition Collateral or DIP Collateral outside of the ordinary course of business, shall be applied to the Indebtedness (in such order as determined by the Lender in its sole discretion) and the Commitment shall be permanently reduced by such amount.

19.    Books and Records.  The Debtors shall permit the Lender and the
Subordinated Secured Lenders and any authorized representatives designated by the Lender or
the Subordinated Secured Lenders (including, without limitation, their auditors, appraisers and
financial advisors) to visit and inspect any of the properties of the Debtors, including the
Debtors' financial and accounting records, and to make copies and take extracts therefrom, and
to discuss the Debtors' affairs, finances and business with the Debtors' officers and independent
public accountants, at such reasonable times during normal business hours and as often as may
be reasonably requested.  Without limiting the generality of the foregoing, the Debtors shall
promptly provide to the Lender and the Subordinated Secured Lenders and their designated
representatives any information or data reasonably requested to monitor the Debtors' compliance
with the covenants in the Pre-Petition Credit Agreement and the provisions of the DIP Loan
Documents and this Order and to perform appraisals or other valuation analyses of any property
of the Debtors.

20.    Authorized Signatories.  The signature of any of:  James Ross, Chief
Restructuring Officer; Rick Anglin, Chief Financial Officer; or the Debtors' attorneys shall bind
the Debtors, and no other approval shall be necessary.

21.    The Lender's Reservation of Rights; No Waiver.  The Lender does not
waive, and expressly reserves, any and all claims, defenses, rights and remedies it has pursuant
to any or all of the DIP Loan Documents, the Bankruptcy Code and/or other applicable law
against the Debtors and any officer, director, employee, agent or other representative of the
Debtors.  In addition, the rights and obligations of the Debtors and the rights, claims, liens,
security interests and priorities of the Lender or the Subordinated Secured Lenders arising under
this Order are in addition to, and are not intended as a waiver or substitution for, the rights,

- 47 -

obligations, claims, liens, security interests and priorities granted by the Debtors, in their pre-petition capacity, under the Pre-Petition Loan Documents, under the Term Loan Documents and under the Indenture Documents. Without limiting the generality of the foregoing, the Lender may petition this Court for any such additional protection it may reasonably require with respect to the Pre-Petition Indebtedness, the DIP Indebtedness or otherwise. Without limiting the generality of the foregoing, the Secured Second Priority Term Loan Holders may petition this Court for any such additional protection they may reasonably require with respect to the Term Loan Indebtedness or otherwise after (a) the indefeasible payment in full in cash of the Indebtedness, the Lender's receipt of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and cash collateralization of 110% of the face amount of undrawn Letters of Credit, (b) termination of the Commitment and (c) the occurrence of a Loan Payment Date. Without limiting the generality of the foregoing, the Secured Third Priority Note Holders may petition this Court for any such additional protection they may reasonably require with respect to the Indenture Indebtedness or otherwise after (a) the indefeasible payment in full in cash of the Indebtedness, the Lender's receipt of cash collateral in an amount sufficient to satisfy any of the Lender's future obligations under the Carve-Out in a manner acceptable to the Lender and the Debtors, and cash collateralization of 110% of the face amount of undrawn Letters of Credit, (b) termination of the Commitment, (c) the occurrence of a Loan Payment Date and (d) indefeasible payment in full in cash of the Term Loan Indebtedness. Nothing in this Order constitutes a finding with respect to the adequacy of the protection of the Lender's interests in the Pre-Petition Collateral.

CH\657231.12

22.     Order Binding on Successors. The provisions of this Order shall be
binding upon and inure to the benefit of the Lender, the Subordinated Secured Lenders, the
Debtors, and their respective successors and assigns (including any trustee or other estate
representative appointed as a representative of either of the Debtors' estates or of either of the
estates in any Successor Case). Notwithstanding anything contained in this Order to the contrary,
the terms and provisions of this Order shall survive, and be in full force and effect, after the
occurrence of a Loan Payment Date and after the indefeasible payment in full in cash of the
Indebtedness and this Order shall, in such event, continue to be binding upon the Subordinated
Secured Lenders. Except as otherwise explicitly set forth in this Order, no third parties are
intended to be or shall be deemed to be third party beneficiaries of this Order or the DIP Loan
Documents.

23.     Effect of Dismissal, Conversion or Substantive Consolidation. If either of
the Chapter 11 Cases is dismissed, converted, otherwise superseded or substantively
consolidated, the Lender's rights and remedies under this Order and the DIP Loan Documents
shall be and remain in full force and effect as if neither of the Chapter 11 Cases had been
dismissed, converted, superseded or substantively consolidated. Furthermore, notwithstanding
any such dismissal, conversion, supercession or substantive consolidation, all of the terms and
conditions of this Order, including, without limitation, the liens and the priorities granted
hereunder, shall remain in full force and effect.

24.     Releases and Validation of Pre-Petition Indebtedness and Liens;
Allowance of Secured Claim. The release, discharge, waivers and agreements set forth in this
ordering paragraph will be deemed effective upon the entry of this Order, subject only to the
right of the Committee and any other party in interest to object on the terms and conditions set

forth in ordering paragraph 26 below. The Debtors and their estates, hereby: (a) release and discharge the Lender, together with its respective affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Pre-Petition Loan Documents, any aspect of the pre-petition relationship between the Lender and the Debtors, or any other acts or omissions by the Lender in connection with, respectively, any of the Pre-Petition Loan Documents or the Lender's pre-petition relationships with the Debtors; (b) release and discharge the Secured Second Priority Term Loan Holders, together with their respective affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Term Loan Documents, any aspect of the pre-petition relationship between the Secured Second Priority Term Loan Holders and the Debtors, or any other acts or omissions by the Secured Second Priority Term Loan Holders in connection with, respectively, any of the Term Loan Documents or the Secured Second Priority Term Loan Holders' pre-petition relationships with the Debtors; (c) release and discharge the Indenture Trustee and the Secured Third Priority Note Holders, together with their respective affiliates, agents, attorneys, officers, directors and employees, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the Indenture Documents, any aspect of the pre-petition relationship between the Secured Third Priority Note Holders or the Indenture Trustee, on the one hand, and the Debtors, on the other hand, or any other acts or omissions by the Secured Third Priority Note Holders or the Indenture Trustee in connection with, respectively, any of the Indenture Documents or the Secured Third Priority Note Holders' or the Indenture Trustee's pre-petition relationships with the Debtors; (d) waive any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the

CH\657231.12